752 A.2d 1199

**COUNTY COUNCIL OF PRINCE GEORGE'S COUNTY,**
**Maryland, Sitting as the District Council**

v.

**Bob DUTCHER.**

**No. 1039, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

June 5, 2000.

414

**416**

Steven M. Gilbert, Principal Counsel of Upper Marlboro, for appellant.

Paul B. Rodbell (Meyers, Rodbell & Rosenbaum, P.A., on the brief), Riverdale, for appellee.

Argued before ADKINS, KRAUSER and PAUL E. ALPERT (Retired, Specially Assigned), JJ.

ADKINS, Judge.

We must decide whether a valid appeal to this Court was timely filed when, pursuant to custom, but without explicit authority, the attorney for the County Council of Prince George's County, Maryland, Sitting as the District Council ("District Council"), appellant, noted an appeal from a circuit court decision reversing a decision of the District Council. For the reasons that follow, we hold that appellant did not file a timely appeal to this Court, and shall therefore dismiss the appeal.

## FACTS

On May 21, 1996, Bob Dutcher, appellee, filed an application with the Maryland–National Capital Park and Planning Commission for approval of the preliminary plan of a subdivision. The property, Brooke–Jane Manor, Section 6, is an 8.83 parcel of land located at the end of Brooke–Jane Drive, west of Brandywine Road in Prince George's County. The property lies south of the intersection of Surratts Road and Branch Avenue, the main intersection serving the property. Appellee planned to divide the property into twenty lots for single family homes.

Pursuant to Prince George's County Code ("PGCC") section 24–124, appellee was required to show the Prince George's County Planning Board ("Planning Board") that there would be adequate access to roads to serve traffic that would be generated by the subdivision, and that the "traffic generated by the proposed subdivision will be accommodated on major intersections and major roadways ... such that they will be functioning below the minimum peak-hours service levels adopted by the Planning Board...." PGCC § 24–124(a)(1) & (2). While a traffic study by the Planning Board was not required, the Planning Board determined that "there is a need to examine current transportation adequacy problems at MD 5/Surratts Road and MD 223/Brandywine Road."

The major concern with the subdivision was its effect on traffic at the intersection of Maryland Route 5 and Surratts

Road ("critical intersection"). In determining whether an intersection can satisfy traffic needs, the Planning Board evaluates "Levels of Service." These levels are measured as A, B, C, D, E, or F, with A being the highest level of service and other grades descending in order. Levels A through D are considered adequate, and levels E and F are considered inadequate.

The Planning Board's technical staff ("staff") initially recommended disapproval of the subdivision. According to the Staff Report, the subdivision would generate fifteen vehicle trips during the "a.m. peak hours" and eighteen trips during the "p.m. peak hours." Furthermore, the report indicated that without the subdivision, the critical intersection operated at an acceptable D level of service and, after adding anticipated traffic from the subdivision, a D level still remained. Nevertheless, the Planning Board's methodology required it to add "background traffic"[1] into the analysis. After doing so, the level of service at the critical intersection fell below the acceptable D grade during the morning and afternoon peak hours.

A hearing before the Planning Board was held on October 31, 1996. At the hearing, the staff indicated that it determined that an unacceptable level of service would be generated at the critical intersection and that appellee had "not proposed improvements to improve the service levels at this intersection." The staff and appellee, however, offered what they considered a possible solution for the problem to the Planning Board—a Traffic Facilities Mitigation Plan ("TFMP") under which appellee agreed to pay a pro rata share to build a "second left turn lane southbound approaching Surratts Road" at the critical intersection. The Planning Board did not vote on the proposed TFMP, but rather,

---

1. Background traffic is traffic generated by "existing plus growth in through traffic plus traffic generated by background developments with funded improvements," *i.e.*, traffic generated by approved but undeveloped subdivisions.

continued the case in order to have a better understanding of the specifics involved in the TFMP.

The Planning Board next addressed appellee's situation on November 7, 1996. At the hearing, a planning staff representative announced that he mis-spoke at the previous hearing when he indicated the TFMP would include a double left turn lane. The staff member explained that the improvements that appellee would bear a pro rata responsibility for were "additional pavement and striping on the eastbound Surratts Road approach and southbound 5 to provide a free right-turn lane from eastbound Surratts Road to southbound MD 5" and "additional pavement and striping on northbound MD 5 to provide a free right-turn land [sic] from westbound Surratts Road to northbound MD 5." Appellee's pro rata share for these improvements would be $23,333, or approximately $1,166 per unit.

The Planning Board issued its conditional approval of the subdivision on December 5, 1996. In its report, the Planning Board noted that no traffic study was done; rather, the mitigation plan was based on a study prepared for a similarly located site that had already been approved.

Pursuant to PGCC § 21–124(a)(6)(D),[2] a local citizens group appealed the Planning Board's decision to the District Council. On May 5, 1997, the District Council remanded the case and ordered the Planning Board to supplement the record with the TFMP and the "agency comments from State Highway Administration and the Department of Public Works and Transportation, to the Planning Board." The Planning Board supplemented the record, and a second appeal was taken to the District Council.

On February 11, 1998, the District Council issued its Notice of Final Decision in which it reversed the Planning Board's decision and denied the mitigation plan. In doing so, the District Council rejected the Planning Board's findings of fact

---

**2.** PGCC § 24–124(a)(6)(D) provides that the "Planning Board action on mitigation may be appealed to the District Council by the applicant or by any party of record."

and made its own finding that the mitigation plan was inadequate. Specifically, the District Council found:

1. [T]hat the intersection of MD Rt. 5 and Surratts Road is currently operating at Level of Service "F," and that mitigation of the traffic at this intersection is required.

2. [T]hat the proposed provisions of a second southbound left-turn lane from MD Rt. 5 on to Surratts Road, including any improvements to the receiving lanes of Surratts Road deemed necessary by the State Highway Administration, are inadequate to alleviate the Level of Service "F" at the [critical] intersection.

3. [T]hat Planning Board Resolution Condition 1, a formula for the assessment per building permit for a pro-rata share of the construction of improvements to the intersection of MD Rt. 5 and Surratts Road as described above, will not alleviate Level of Service "F" at this intersection.

4. [T]hat the transportation infrastructure (existing and proposed) is inadequate to service the proposed Preliminary Plat of Subdivision.

5. [T]hat the mitigation plan proposed by [appellee] is inadequate to reduce the existing Level of Service "F" at the [critical] intersection . . . Therefore, the proposed mitigation is unacceptable and must be denied[.]

Pursuant to Md.Code (1957, 1997 Repl.Vol.), Art. 28 ("Art. 28"), § 8–106(e), appellee appealed the decision of the District Council to the circuit court. In a written order and opinion, the circuit court reversed the decision of the District Council. The circuit court held: (1) that the District Council is required to give deference to the factual findings of the Planning Board; and (2) facts in the record did not support the District Council's conclusions. This appeal followed.

## DISCUSSION

### Timeliness of appeal

Appellee contends that the District Council's attorney did not have authority to file the instant appeal and that no timely

appeal was filed. Final judgment in the circuit court was entered on June 9, 1999. This appeal was noted by appellant's attorney on July 7, 1999. The District Council, however, did not vote to authorize the appeal until July 13, 1999, four days past the expiration of the thirty-day appeal period provided by Maryland Rule 8–202.[3] Appellee contends that the appeal must be dismissed because an appeal of a "final judgment to which the District Council is a party, is not authorized until such time as a vote to appeal the final judgment is formally taken by the District Council," and relies on *Comm. on Hum. Rel. v. Anne Arundel Co.,* 106 Md.App. 221, 664 A.2d 400 (1995).

In *Anne Arundel,* this Court addressed the capacity of an administrative agency to seek judicial review. In *Anne Arundel,* the petition for judicial review and appeal to this Court was authorized by the agency's executive director and general counsel. On our own motion, we raised the issue of whether the executive director and general counsel possessed standing to seek judicial review.

In reaching our decision, we observed that an administrative agency does not have the right to seek review of its own final decision absent statutory authority. *See id.* at 237–38, 664 A.2d 400. Moreover, "[w]e recognize[d] that, where judicial review is provided by statute, the statutory method of review is exclusive . . . [and] defines the limits of the court's power to review the determinations of the agency." *Id.* at 238, 664 A.2d 400. We held that the general counsel and executive director did not have standing to authorize the appeal because the statute granting the agency power to seek judicial review vested that power in the agency, and a vote by the agency's commissioners was necessary to seek judicial review. In doing so, we explained:

Because the power to authorize judicial review rests exclusively in the 'agency' by statute, the Commissioners them-

---

**3.** Rule 8–202 provides that "the notice of appeal shall be filed within 30 days after entry of the judgment or order from which the appeal is taken."

selves must sanction any determination to adjudicate a contested ... case beyond the decision of [the agency]. *Id.* at 241, 664 A.2d 400.

In the instant case, the District Council's authority to seek an appeal to this Court is found in Art. 28, § 8–106(j), which states:

In Prince George's County, the district council, the applicant, or any party to the circuit court review who is an aggrieved party may secure a review of any final judgment of the Prince George's County Circuit Court under this title by appeal to the Court of Special Appeals. The appeal shall be taken in the manner provided by law for appeals from law courts in other civil cases. Each member of the district council in Prince George's County is entitled to vote on whether the district council shall appeal to the Court of Special Appeals, regardless of whether the member participated in the hearing on the matter or in the decision.

■■■ In analyzing a statute, we must ascertain and carry out the true intentions of the legislature. *See Tortuga v. Wolfensberger,* 97 Md.App. 79, 84, 627 A.2d 56, *cert. denied,* 332 Md. 703, 632 A.2d 1209 (1993). To discern the legislative intent, we look to the plain meaning of the language of the statute. *See Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 73, 517 A.2d 730 (1986). "Where the language is clear and unambiguous, a court may not add or delete words to make a statute reflect an intent not evidenced in that language to avoid a harsh result." *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753 (1993) (citation omitted).

■■■ Appellant contends that the statutory language does not require its members to approve an appeal within the thirty-day period, and that the District Council's vote on July 13, after the thirty-day appeal period, was sufficient to satisfy the section 8–106(j) requirement that each member of the council "is entitled to vote on whether the district council shall appeal." To accept this argument would be to ignore the teachings of *Anne Arundel,* in which we held that to be properly noted, the appeal must "be approved by the ...

group of individuals ... within whom is reposed the ultimate legal authority to pursue such review." *Anne Arundel,* 106 Md.App. at 241, 664 A.2d 400.

■ Appellant further contends that its attorney had "standing authorization" to file the notice of appeal on behalf of the District Council and "was authorized to do, by the practice accepted and followed for many years." Specifically, appellant proffers that:

By prior practice in administrative cases, from about 1982 to the present, the District Council's standing authorization and instructions to its attorneys have been as follows: First, the attorney is authorized and directed to appear in every case appealing or challenging a District Council decision; second, the attorney is required to defend all actions of the Council, including all findings, orders, and conditions; third, the attorney is authorized and required to preserve all District Council rights in litigation, unless the Council approves a dismissal, compromise, or waiver of rights; and fourth, the Council is to be advised by the attorney of the course of litigation and the need for a decision, whenever required.

It presents affidavits from its Principal Counsel and Council Administrator, which support the proffer in its brief.

A similar argument, however, was presented and rejected in *Anne Arundel.* There, we characterized the customary practice regarding appeals by the Commission on Human Relations:

[C]ounsel for the Commission conceded that the Executive Director of the Commission and the agency's General Counsel, and not the Commissioners, had made the decision to seek review of the Board's decision. The Commission's appellate counsel proffered to us that, at some unspecified time in the past, the Commissioners had delegated to the Executive Director and the General Counsel the authority to determine whether to take an appeal of an appeal board's action. Counsel conceded, however, that such delegation was merely an unmemorialized internal agency practice that

had not been authorized by any statute, COMAR rule, or, for that matter, any published rule or edict generally discoverable by the public. **Apparently, it has merely been, at best, a policy of some duration within the institutional memory of at least some Commission staff** that the Executive Director and General Counsel make the decision whether to seek judicial review in contested cases on an *ad hoc* basis.

*Id.* at 240–41, 664 A.2d 400 (bold emphasis added) (footnote omitted).

The long-standing practice, described in the present case, of having the Principal Counsel and Council Administrator make the decision to file an appeal to protect the interests of the District Council, is not meaningfully different from the long-standing practice of the Commission on Human Relations proffered to and rejected by us in *Anne Arundel.* We only reiterate the conclusion reached in *Anne Arundel,* as we conclude that the tradition of allowing Principal Counsel, in conjunction with the Council Administrator, to file appeals is not an effective delegation of the District Council's right to decide whether to appeal.[4]

▮ Lastly, appellant contends that the notice of appeal was sufficient because it was ratified by the District Council membership after the thirty-day appeal time had expired. In support of this contention, appellant cites *Switkes v. John McShain,* 202 Md. 340, 350, 96 A.2d 617 (1953), for the proposition that a client may ratify an appeal after its filing. Appellant's reliance of *Switkes* is misplaced.

*Switkes* involved a lawyer filing an appeal of a workmen's compensation claim to the Court of Common Pleas on behalf of his client, who had died two days before the notice was filed. After the thirty-day period for filing a timely appeal passed, the deceased widow was substituted as an appellant.

---

4. Our decision would likely be different if the record contained a resolution, duly adopted by the District Council, prior to the time for filing this appeal, explicitly delegating to its attorney(s) the power of the District Council to note an appeal to this Court.

The widow argued that the appeal was properly filed and should not be dismissed because the opposing party had "received actual notice of the intention to appeal within the prescribed time, [has] not been prejudiced, and the appeal should be considered as having been taken by the widow . . . since she ratified the action taken in the name of her dead husband." *Id.* at 342–43, 96 A.2d 617.

The Court of Appeals disagreed and held that the appeal was properly dismissed. First, the Court recognized that the death of a client terminates an attorney's power to act in the name of the client. *See id.* at 348, 96 A.2d 617. The Court further found that the widow was not substituted as a party within the time prescribed by law to file an appeal. For these reasons, the Court held dismissal was proper because the original appeal was not properly filed and the substitution of the widow came after the time period prescribed by law for noting an appeal. The Court explained that the substitution of

> the widow . . . as an appellant . . . conferred no rights upon her . . . since it came too late. . . . It could not be considered a ratification of the appeal which had been taken earlier, because there was nothing to ratify, that appeal having been a nullity. . . . '[T]here was no appeal properly made . . . and the mere appearance of the heirs . . . does not stand in the way of the motion to dismiss; their appearance being without authority, and the case standing, as if no such appearance had been entered.'

*Id.* at 350, 96 A.2d 617 (citations omitted).

The concept that ratification of the decision to appeal could occur outside of the thirty-day window was considered and rejected in *Anne Arundel,* in which we stated:

> [A]ssuming that the Commissioners did not specifically authorize the Executive Director and General Counsel to file the petition for judicial review that was filed in this case, the Commission Chairperson's 29 April 1994 execution of the notice to the parties required by Rule 7–202(d)(2) is the equivalent of a ratification by the 'agency' after the fact. . . .

[For such action to be considered ratification], however, the record would need to disclose, at a minimum, that the execution of the Rule 7–202(d)(2) notice by the Commission Chairperson **came within the time during which a petition for judicial review could have been filed had the Commissioners themselves actually acted to authorize the seeking of such relief.**

*Anne Arundel,* 106 Md.App. at 242 n. 9, 664 A.2d 400 (bold emphasis added).

Appellant's attorney filed an unauthorized appeal that had no legal effect. After the expiration of the time to file a timely appeal, any appeal by the District Council to this Court is untimely. *See* Md. Rule 8–202. Therefore, because appellant failed to take proper action and approve the filing of the appeal within thirty days of the final judgment of the circuit court, we dismiss the appeal.

### Correctness of Planning Board decision

██ Even were we to hold the appeal was timely, appellee would still prevail. Judicial review of an administrative agency decision is narrow. "When asked to review a decision of an administrative agency, a reviewing court must give the decision great weight and a presumption of validity." *County Council of P.G. County v. Curtis Regency,* 121 Md.App. 123, 133, 708 A.2d 1058, *cert. denied,* 351 Md. 5, 715 A.2d 964 (1998). "A court's role is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226 (1994).

██ In *Colao v. Prince George's County Council,* 109 Md.App. 431, 675 A.2d 148 (1996), *aff'd,* 346 Md. 342, 697 A.2d 96 (1997), we articulated the following standard:

'In regard to findings of fact, the trial court cannot substitute its judgment for that of the agency and must accept the agency's conclusions if they are based on substantial evi-

dence and if reasoning minds could reach the same conclusion based on the record; when reviewing findings of law, however, no such deference is given to the agency's conclusion.'

*Id.* at 458, 675 A.2d 148. (quoting *Columbia Road Citizens' Assoc. v. Montgomery County,* 98 Md.App. 695, 698, 635 A.2d 30 (1994)); *see also Belvoir Farms v. North,* 355 Md. 259, 267, 734 A.2d 227 (1999) ("a decision of an administrative agency . . . is owed no deference when its conclusions are based upon an error of law.").

■■■■■■ The question of whether an administrative agency's decision is supported by substantial evidence turns on the question of whether the board's decision is "fairly debatable." *See North v. St. Mary's County,* 99 Md.App. 502, 509, 638 A.2d 1175, *cert. denied sub nom., Enoch v. North,* 336 Md. 224, 647 A.2d 444 (1994). The decision will be upheld when "a reasoning mind reasonably could have reached the factual conclusion the agency reached; this need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment." *Evans v. Shore Communications,* 112 Md.App. 284, 298, 685 A.2d 454 (1996). Nevertheless, when an authority's decision is not supported by substantial evidence, it cannot be said to be "fairly debatable" and " 'falls into the category of being arbitrary, capricious and a denial of due process of law.' " *North,* 99 Md. App. at 509, 638 A.2d 1175 (quoting *Neuman v. Mayor & City Council,* 23 Md.App. 13, 14, 325 A.2d 146 (1974)).

■■■■ In *Curtis Regency,* we addressed the issue of whether the District Council owed deference to the fact finding and conclusions of the Planning Board. We held that the District Council exercised only *appellate* jurisdiction and

'may not substitute its judgment for that of the [Planning Board], even if it, had it been so empowered, might have made a diametrically different decision. The circumstances under which it may overturn or countermand a decision of the [Planning Board] are narrowly constrained. It may never simply second guess.'

*Curtis Regency,* 121 Md.App. at 137, 708 A.2d 1058 (quoting *People's Counsel for Baltimore County v. Beachwood I Ltd. Partnership,* 107 Md.App. 627, 638, 670 A.2d 484 (1995)).[5] We, therefore, must review the factual findings and conclusions of the Planning Board and determine whether its findings are "fairly debatable."

■■■ As indicated above, the staff originally recommended disapproval of the subdivision because the traffic generated by the subdivision and "background traffic" resulted in a D grade level of service during morning and peak hours. The Prince George's County Council, however, has developed "Guidelines for Mitigation Actions" ("Guidelines"), which provide means for development in areas where the level of service falls below acceptable levels. Particularly, PGCC section 24–124(a)(6)(C)provides:

> Where existing traffic service in the service area is at the acceptable peak-hour service level threshold or better, as defined in the 'Guidelines,' and if the total traffic service in the study area is no greater than ten percent (10%) above the acceptable peak-hour service level threshold as defined in the 'Guidelines' and the proposed subdivision generates less than twenty-five (25) A.M. or P.M. peak-hour trips, the Planning Board may require that the subdivider . . . shall be responsible for the pro rata cost of the physical improvements necessary to alleviate the inadequacy as defined in the 'Guidelines.'

In 1994, the Prince George's County Council adopted Resolution 29–1994 for "the purpose of approving the [Guidelines], which are to be incorporated into the subdivision procedures

---

5. Shortly before our decision in *Curtis Regency,* Prince George's County amended the ordinance authorizing review by the District Council and granted the Council "original jurisdiction." In *Curtis Regency,* we questioned the validity of such a grant "since it would appear to contradict the exclusive jurisdiction given to the Planning Board by public general law." *Curtis Regency,* 121 Md.App. at 135 n. 4, 708 A.2d 1058. The trial court held that the grant of original jurisdiction was unconstitutional for this reason. Appellant does not challenge this finding on appeal and admits that an appellate standard of review of the Planning Board's decision is appropriate.

of the Planning Board's 'Guidelines for the Analysis of the Traffic Impact of Development Proposals.'" The Guidelines define mitigation as:

a process developed by the Prince George's County Council by which developments in certain areas of the County are allowed to provide roadway improvements (or funding for transportation improvements) which would improve traffic operations at nearby intersections. Mitigation represents a departure from the remainder of these Guidelines in that *these improvements need not achieve Level-of-Service D operations* on the affected links or at the affected interchanges or intersections. These mitigation procedures would allow development to proceed in certain areas experiencing unacceptable transportation service levels; however, the development could occur only if transportation improvements are made which *would result in an improvement in traffic operations beyond what would have been expected if the development had not occurred.* (Emphasis added).

Under section 24–124(a)(6)(C) the subdivision had to meet certain criteria before mitigation could be considered: (1) the existing traffic levels of service at the critical intersection must meet level D standards during the morning and afternoon peak hours; (2) total traffic levels of service at the critical intersection must not be greater than 10% above the acceptable peak-hour service level; and (3) the proposed subdivision must generate less than twenty-five peak hour trips. If the above criteria are satisfied, the subdivision may be approved based on a TFMP provided for under the Guidelines. We, therefore, turn to the record before the Planning Board to determine if the above criteria have been satisfied.

During the July 3, 1997 hearing, the staff indicated that the subdivision "appears to meet all of the criteria that are required as a part of the mitigation ordinance and the mitigation guidelines." According to the Staff Report, the critical intersection is currently operating at a D level of service. Additionally, the evidence is uncontradicted that the subdivision would generate less than twenty-five a.m. and p.m. peak hour trips. Specifically, the Staff Report indicates that the

subdivision.would generate fifteen trips during the a.m. peak hours and eighteen trips during the p.m. peak hours.

The Staff Report indicates that the highest acceptable critical lane volume to achieve a D level of service is 1450. In order to meet the mitigation criteria (service levels not greater than 10% above the acceptable peak-hour service level), the total traffic in the critical intersection may not exceed 1595 during a.m. and p.m. peak hours. A staff member testified that the current traffic levels at the critical intersection fell within the requirement, as total traffic in the a.m. peak hours was 1595, with an E level of service, and 1548 in the p.m. peak hours, also with an E level of service. Finally, a staff member testified that the TFMP would improve traffic operations beyond what there would be without development because, "with the improvements as recommended in the mitigation plan, in the AM the total traffic would be 1540, with a level of service E. And in the PM ... the critical lane volume would be 1524, with a level of service E."

The Planning Board concluded that the TFMP sufficiently addressed the traffic concerns and approved appellee's subdivision plan. The facts contained in the record provide substantial evidence that the criteria set forth in the Guidelines has been satisfied. Therefore, the decision of the Planning Board is fairly debatable and should not have been reversed by appellant.

 Appellant further contends that the Planning Board's decision must be reversed because appellee did not submit a traffic impact study. According to appellant, "an applicant must submit a 'traffic impact analysis (TIA)' for a 'study area' staff selects" and must submit a TFMP.

Appellant is correct that the Guidelines contain a general requirement that an applicant must submit a TIA and TFMP. Nevertheless, the Guidelines provide that "[a]lternative mitigation strategies are allowed for smaller development proposals," and appellee's proposed subdivision fell within the category of "smaller developments". In such a case, the Guidelines provide that the applicant is not required to submit a traffic

study or TFMP; rather, the Planning Board's staff "will prepare a TFMP for the significant transportation facilit(ies) which are proposed as mitigation candidate(s)." The staff followed this procedure, and the TFMP for the critical intersection served as the basis for approval of the proposed subdivision. Moreover, although no traffic study was done, the staff's use of "a review of other traffic-related information in the area, particularly information related to [another subdivision] which was approved by the Planning Board ... conducted by the staff ... [and] consistent with" the Guidelines, was sufficient to form the TFMP.

In reversing the Planning Board's decision, appellant rejected the Planning Board's findings of fact and made its own findings regarding the proposed subdivision's eligibility for mitigation and the adequacy of the TFMP. In doing so, appellant overstepped its authority in reversing the Planning Board. *See Curtis Regency,* 121 Md.App. at 137, 708 A.2d 1058 (holding that District Council's authority is limited to determining whether Planning Board's decision "was arbitrary, capricious, discriminatory or illegal."). The Planning Board's decision was fairly debatable and based on substantial evidence.

## CONCLUSION

We dismiss the appeal on grounds that it was not timely filed. We conclude, however, that even were the appeal filed timely, the circuit court's decision to reverse the District Council's reversal of the Planning Board was appropriate, and we would affirm the appeal.

**APPEAL DISMISSED. COSTS TO BE PAID BY APPELLANT.**